1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   MARK R. BECKINGTON, State Bar No. 126009
    Supervising Deputy Attorney General
3   BENJAMIN M. GLICKMAN, State Bar No. 247907
    Deputy Attorney General
4     1300 I Street, Suite 125
      P.O. Box 944255
5     Sacramento, CA 94244-2550
      Telephone:  (916) 323-7355
6     Fax:  (916) 324-8835
      E-mail:  Benjamin.Glickman@doj.ca.gov
7
    *Attorneys for Defendants*
8

9               IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13
    **LANDSLIDE COMMUNICATIONS, INC.**          2:13-cv-00716-GEB-KJN
14  **and JAMES V. LACY, IN HIS CAPACITY**
    **AS PRESIDENT OF LANDSLIDE**              **DECLARATION OF JOEL**
15  **COMMUNICATIONS, INC.,**                  **TOCHTERMAN IN SUPPORT OF**
                                               **DEFENDANTS' MOTION FOR**
16                            Plaintiffs,      **SUMMARY JUDGMENT AND IN**
                                               **OPPOSITION TO PLAINTIFFS'**
17       v.                                    **MOTION FOR SUMMARY JUDGMENT**

18  **STATE OF CALIFORNIA; KAMALA**            Date:          November 4, 2013
19  **HARRIS, in her capacity as Attorney**    Time:          9:00 a.m.
    **General of California; CALIFORNIA FAIR** Dept:          10
20  **POLITICAL PRACTICES COMMISSION;**        Judge:         Hon. Garland E. Burrell, Jr.
    **ANN RAVEL, in her capacity as Chair of** Action Filed:  4/11/2013
21  **the Fair Political Practices Commission,**

22                            Defendants.

23

24

25

26

27

28

1    I, Joel Tochterman, declare as follows:

2    1.    I am a Librarian for the Office of the Attorney General in the California Department

3    of Justice, located in Sacramento, California.  I have been trained and am familiar with our

4    office's methods for researching and compiling legislative histories.  My job duties regularly

5    include collecting legislative history materials for attorneys in this office.  I am also custodian of

6    the records retained in the library's files, including legislative histories compiled by our office's

7    trained librarian.  I make this declaration in support of Defendants' Motion for Summary

8    Judgment and in opposition to Plaintiffs' Motion for Summary Judgment.  I have personal

9    knowledge of the facts stated in this declaration, and if called as a witness, I could and would

10   competently testify to them.

11   2.    Trained librarians in our office regularly compile legislative histories when requested

12   to do so by attorneys in the Attorney General's Office.  These librarians compile legislative

13   histories of California statutes from the entire history pertaining to the statute as presented,

14   chaptered, and archived as public records by the California Secretary of State, California

15   Legislative Counsel, and other sources of legislative history.  After a legislative history has been

16   complied, we add it to our collection of legislative histories, and retain it in the library's files.

17   3.    On or about September 9, 2013, I located in our collection a legislative history for

18   1987 Senate Bill 1311 (1987 Cal. Stat., ch. 905) compiled by a librarian of the Office of the

19   Attorney General.  Attached hereto as Exhibit A are true and correct copies of selected documents

20   that were part of that legislative history:

21   a.    California Statutes 1987, chapter 905, pages 2900 through 2906 [pages 1–7];

22   b.    Press Release, Office of the Governor (September 21, 1987) [page 8];

23   c.    Letter from Senator William A. Craven to Governor George Deukmejian

24        (September 15, 1987) [pages 9–10];

25   d.    Letter from Fair Political Practices Commission to Governor George Deukmejian

26        (September 15, 1987) [pages 11–12];

27   e.    Senate Elections Committee Analysis (May 29, 1987) [pages 13–16];

28

1

f.   Assembly Committee on Elections, Reapportionment and Constitutional Amendments Analysis (August 19, 1987) [pages 17–21];

g.   Press Release, Senator William A. Craven (March 10, 1987) [pages 22–23];

h.   Memorandum, *Subject: Slate Mailer Hearing*, Fair Political Practices Commission (December 1, 1986) [pages 24–30]; and

i.   Copies of various contemporaneous newspaper articles regarding slate mailers and proposed legislation [pages 31–41].

4.   The legislative history documents contained in Exhibit A are true and correct copies of the original public records obtained by the designated official from public sources in California, except that: (i) for ease of reference, Bates numbering has been added to the bottom right corner of each page and the documents have been rearranged in reverse chronological order; and (ii) for readability purposes, pages may have been enlarged.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct of my own personal knowledge, and that this declaration is executed in Sacramento, California, this _17_ th day of September, 2013.

_Joel Tochterman_
Joel Tochterman

SA2013111001
20130917 FPPC Decl of Joel Tochterman.doc

2

# EXHIBIT A

## CHAPTER  905

An act to add Sections 82048.3, 82048.5, 84108, 84218, 84219, 84220, 84221, and 84305.5 to the Government Code, relating to the Political Reform Act of 1974.

[Approved by Governor September 19, 1987. Filed with
Secretary of State September 21, 1987.]

*The people of the State of California do enact as follows:*

SECTION 1.   Section 82048.3 is added to the Government Code, to read:

82048.3.   "Slate mailer" means a mass mailing which supports or opposes a total of four or more candidates or ballot measures.

SEC. 2.   Section 82048.5 is added to the Government Code, to read:

82048.5.   (a) "Slate mailer organization" means, except as provided in subdivision (b), any person who, directly or indirectly, does all of the following:

(1)  Is involved in the production of one or more slate mailers and exercises control over the selection of the candidates and measures to be supported or opposed in the slate mailers.

(2)  Receives or is promised payments totaling five hundred dollars ($500) or more in a calendar year for the production of one or more slate mailers.

(b)  Notwithstanding subdivision (a), a slate mailer organization shall not include any of the following:

(1)  A candidate or officeholder or a candidate's or officeholder's controlled committee.

(2)  An official committee of any political party.

(3)  A legislative caucus committee.

(4)  A committee primarily formed to support or oppose a candidate, officeholder, or ballot measure.

(c)  The production and distribution of slate mailers by a slate mailer organization shall not be considered making contributions or expenditures for purposes of subdivision (b) or (c) of Section 82013. If a slate mailer organization makes contributions or expenditures other than by producing or distributing slate mailers, and it reports those contributions and expenditures pursuant to Sections 84218 and 84219, no additional campaign reports shall be required of the slate mailer organization pursuant to Section 84200 or 84200.5.

SEC. 3.   Section 84108 is added to the Government Code, to read:

84108.   (a)  Every slate mailer organization shall comply with the requirements of Sections 84100, 84101, 84103, and 84104.

(b)  The statement of organization of a slate mailer organization shall include:

(1)  The name, street address, and telephone number of the organization.

76820

TOCHTERMAN EXHIBIT A, Page 1

4191-0007

(2) The full name, street address, and telephone number of the treasurer and other principal officers.

(3) The full name, street address, and telephone number of each person with final decisionmaking authority as to which candidates or measures will be supported or opposed in the organization's slate mailers.

(c) The statement of organization shall be filed with the Secretary of State within 10 days after the slate mailer organization receives or is promised five hundred dollars ($500) or more for producing one or more slate mailers. However, if an entity qualifies as a slate mailer organization before the date of an election in which it is required to file preelection statements, but after the closing date of the last campaign statement required to be filed before the election pursuant to Section 84218, the slate mailer organization shall file with the Secretary of State, by telegram or personal delivery within 24 hours of qualifying as a slate mailer organization, the information required to be reported in the statement of organization.

SEC. 4.   Section 84218 is added to the Government Code, to read:

84218.   (a) A slate mailer organization shall file semiannual campaign statements for each period in which it has received payments totaling five hundred dollars ($500) or more from any person for the support of or opposition to candidates or ballot measures in a slate mailer, or in which it has expended five hundred dollars ($500) or more to produce one or more slate mailers. The semiannual statements shall be filed no later than July 31 for the period ending June 30, and no later than January 31, for the period ending December 31.

(b) In addition to the semiannual statements required by subdivision (a), slate mailer organizations shall file preelection statements as follows:

(1) Any slate mailer organization which produces a slate mailer supporting or opposing candidates or measures being voted on in an election held upon the first Tuesday after the first Monday in June or November of an even-numbered year shall file the statements specified in Section 84200.7 if, during the period covered by the preelection statement, the slate mailer organization receives payments totaling five hundred dollars ($500) or more from any person for the support of or opposition to candidates or ballot measures in one or more slate mailers, or expends five hundred dollars ($500) or more to produce one or more slate mailers.

(2) Any slate mailer organization which produces a slate mailer supporting or opposing candidates or measures being voted on in an election held on a date other than the first Tuesday after the first Monday in June or November of an even-numbered year shall file the statements specified in Section 84200.8 if, during the period covered by the preelection statement, the slate mailer organization receives payments totaling five hundred dollars ($500) or more from any person for the support of or opposition to candidates or ballot measures in one or more slate mailers, or expends five hundred

Case 2:13-cv-00716-GEB-KJN Document 26-2 Filed 09/19/13 Page 7 of 45

dollars ($500) or more to produce one or more slate mailers.

(c) A slate mailer organization shall file two copies of its campaign reports with the clerk of the county in which it is domiciled. A slate mailer organization is domiciled at the address listed on its statement of organization unless it is domiciled outside California, in which case its domicile shall be deemed to be Los Angeles County for purposes of this section.

In addition, slate mailer organizations shall file campaign reports as follows:

(1) A slate mailer organization which produces one or more slate mailers supporting or opposing candidates or measures voted on in a state election, or in more than one county, shall file campaign reports in the same manner as state general purpose committees pursuant to subdivision (a) of Section 84215.

(2) A slate mailer organization which produces one or more slate mailers supporting or opposing candidates or measures voted on in only one county, or in more than one jurisdiction within one county, shall file campaign reports in the same manner as county general purpose committees pursuant to subdivision (d) of Section 84215.

(3) A slate mailer organization which produces one or more slate mailers supporting or opposing candidates or measures voted on in only one city shall file campaign reports in the same manner as city general purpose committees pursuant to subdivision (e) of Section 84215.

(4) Notwithstanding the above, no slate mailer organization shall be required to file more than the original and one copy, or two copies, of a campaign report with any one county or city clerk or with the Secretary of State.

SEC. 5. Section 84219 is added to the Government Code, to read:

84219. Whenever a slate mailer organization is required to file campaign reports pursuant to Section 84218, the campaign report shall include the following information:

(a) The total amount of receipts during the period covered by the campaign statement and the total cumulative amount of receipts. For purposes of this section only, "receipts" means payments received by a slate mailer organization for production and distribution of slate mailers.

(b) The total amount of disbursements made during the period covered by the campaign statement and the total cumulative amount of disbursements. For purposes of this section only, "disbursements" means payment made by a slate mailer organization for the production or distribution of slate mailers.

(c) For each candidate or committee that is a source of receipts totaling one hundred dollars ($100) or more during the period covered by the campaign statement:

(1) The name of the candidate or committee, identification of the jurisdiction and the office sought or ballot measure number or letter, and if the source is a committee, the committee's identification number, street address, and the name of the candidate or measure

TOCHTERMAN EXHIBIT A, Page 3

4191-0009

on whose behalf or in opposition to which the payment is made.

(2)  The date and amount received for each receipt totaling one hundred dollars ($100) or more during the period covered by the campaign statement.

(3)  The cumulative amount of receipts on behalf of or in opposition to the candidate or measure.

(d)  For each person other than a candidate or committee who is a source of receipts totaling one hundred dollars ($100) or more during the period covered by the campaign statement:

(1)  Identification of the jurisdiction, office or ballot measure, and name of the candidate or measure on whose behalf or in opposition to which the payment was made.

(2)  Full name, street address, name of employer or, if self-employed, name of business, of the source of receipts.

(3)  The date and amount received for each receipt totaling one hundred dollars ($100) or more during the period covered by the campaign statement.

(4)  The cumulative amount of receipts on behalf of or in opposition to the candidate or measure.

(e)  For each candidate or ballot measure not reported pursuant to subdivision (c) or (d), but who was supported or opposed in a slate mailer sent by the slate mailer organization during the period covered by the report, identification of jurisdiction, office or ballot measure, and name of the candidate or measure who was supported or opposed.

(f)  The total amount of disbursements made during the period covered by the campaign statement to persons who have received one hundred dollars ($100) or more.

(g)  The total amount of disbursements made during the period covered by the campaign statement to persons who have received less than one hundred dollars ($100).

(h)  For each person to whom a disbursement of one hundred dollars ($100) or more has been made during the period covered by the campaign statement:

(1)  His or her full name.

(2)  His or her street address.

(3)  The amount of each disbursement.

(4)  A brief description of the consideration for which each disbursement was made.

(5)  The information required in paragraphs (1) to (4), inclusive, for each person, if different from the payee, who has provided consideration for a disbursement of one hundred dollars ($100) or more during the period covered by the campaign statement.

(i)  Cumulative disbursements, totaling one thousand dollars ($1,000) or more, made directly or indirectly to any person listed in the slate mailer organization's statement of organization. For purposes of this subdivision, a disbursement is made indirectly to a person if it is intended for the benefit of or use by that person or a member of the person's immediate family, or if it is made to a

76890

TOCHTERMAN EXHIBIT A, Page 4

Case 2:13-cv-00716-GEB-KJN Document 26-2 Filed 09/19/13 Page 9 of 45

business entity in which the person or member of the person's immediate family is a partner, shareholder, owner, director, trustee, officer, employee, consultant, or holds any position of management or in which the person or member of the person's immediate family has an investment of one thousand dollars ($1,000) or more. This subdivision shall not apply to any disbursement made to a business entity whose securities are publicly traded.

(j) The full name, street address, and telephone number of the slate mailer organization and of the treasurer.

(k) Whenever a slate mailer organization also qualifies as a general purpose committee pursuant to Section 82027.5, the campaign report shall include, in addition to the information required by this section, the information required by Section 84211.

SEC. 6. Section 84220 is added to the Government Code, to read:

84220. If a slate mailer organization receives a payment of two thousand five hundred dollars ($2,500) or more for purposes of supporting or opposing any candidate or ballot measure in a slate mailer, and the payment is received at a time when, if the payment were a contribution it would be considered a late contribution, then the slate mailer organization shall report the payment in the manner set forth in Section 84203 for candidates and committees when reporting late contributions received. The slate mailer organization shall, in addition to reporting the information required by Section 84203, identify the candidates or measures whose support or opposition is being paid for, in whole or in part, by each late payment.

SEC. 7. Section 84221 is added to the Government Code, to read:

84221. Slate mailer organizations shall terminate their filing obligations in the same manner as applies to committees qualifying under subdivision (a) of Section 82013.

SEC. 8. Section 84305.5 is added to the Government Code, to read:

84305.5. (a) No slate mailer organization shall send a slate mailer unless:

(1) The name, street address, and city of the slate mailer organization are shown on the outside of each piece of slate mail and on at least one of the inserts included with each piece of slate mail in no less than 8-point roman type which shall be in a color or print which contrasts with the background so as to be easily legible. A post office box may be stated in lieu of a street address if the organization's street address is a matter of public record with the Secretary of State's Political Reform Division.

(2) At the top or bottom of the front side or surface of at least one insert or at the top or bottom of one side or surface of a postcard or other self-mailer, there is a notice in at least 8-point roman, boldface type, which shall be in a color or print which contrasts with the background so as to be easily legible, and in a printed or drawn box and set apart from any other printed matter. The notice shall consist of the following statement:

76930

TOCHTERMAN EXHIBIT A, Page 5

4191-0011

---

### NOTICE TO VOTERS

THIS DOCUMENT WAS PREPARED BY (name of slate mailer organization), NOT AN OFFICIAL POLITICAL PARTY ORGANIZATION.   Appearance in this mailer does not necessarily imply endorsement of others in this mailer.  Appearance is paid for and authorized by each candidate and ballot measure which is designated by an *.

---

(3) The name, street address, and city of the slate mailer organization as required by paragraph (1) and the notice required by paragraph (2) may appear on the same side or surface of an insert.

(4) Each candidate and each ballot measure which has paid to appear in the slate mailer is designated by *. Any candidate or ballot measure which has not paid to appear in the slate mailer is not designated by *.

The * required by this subdivision shall be of the same type size, type style, color or contrast, and legibility as is used for the name of the candidate or the ballot measure name or number and position advocated to which the * designation applies except that in no case shall the * be required to be larger than 10-point boldface type. The designation shall immediately follow the name of the candidate, or the name or number and position advocated on the ballot measure where the designation appears in the slate of candidates and measures. If there is no slate listing, the designation shall appear at least once in at least 8-point boldface type, immediately following the name of the candidate, or the name or number and position advocated on the ballot measure.

(b) For purposes of the designations required by paragraph (4) of subdivision (a), the payment of any sum made reportable by the provisions of subdivision (c) of Section 84219 by or at the behest of a candidate or committee, whose name or position appears in the mailer, to the slate mailer organization, shall constitute a payment to appear, requiring the * designation. Such payment shall also be deemed to constitute authorization to appear in the mailer.

(c) A slate mailer which complies with the requirements of this section shall be deemed to satisfy the requirements of Sections 11703 and 11704 of the Elections Code.

SEC. 8.5.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs which may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, changes the definition of a crime or infraction, changes the penalty for a crime or infraction, or eliminates a crime or infraction.

SEC. 9.   The Legislature finds and declares that the provisions of this act further the purposes of the Political Reform Act of 1974

Case 2:13-cv-00716-GEB-KJN   Document 26-2   Filed 09/19/13   Page 11 of 45

within the meaning of subdivision (a) of Section 81012 of the Government Code.

————

## CHAPTER 906

An act to amend Section 25612 of the Health and Safety Code, relating to seafood, and making an appropriation therefor.

[Approved by Governor September 19, 1987. Filed with
Secretary of State September 21, 1987.]

I am deleting the $30,000 appropriation contained in Section 4 of Senate Bill No. 1188.

This bill would appropriate $30,000 to the Department of Health Services to conduct a shellfish sampling and monitoring program in Humboldt Bay and prohibits the sale of such seafood if the study determines a threat to human health.

I approved a $1.3 million appropriation in 1985 to support a study of marine pollution and related health concerns. It is more appropriate to direct funds from this account for the proposed Humboldt Bay monitoring program rather than provide an additional appropriation.

With this deletion, I approve Senate Bill No. 1188.

GEORGE DEUKMEJIAN, Governor

*The people of the State of California do enact as follows:*

SECTION 1. Section 25612 of the Health and Safety Code is amended to read:

25612. The department, utilizing available funds and in cooperation with the Department of Fish and Game and the Joint Committee on Fisheries and Aquaculture, shall do all of the following:

(a) Cooperate with any federal agency that conducts monitoring of marine life or ocean waters, or both, at the sites of radioactive waste dumping off the California coast to determine the effects of the dumping.

(b) Purchase and test samples of seafood taken in the vicinity of the Farallon Islands radioactive waste dump site to determine whether the seafood contains radioactivity beyond natural and artificial background levels.

(c) Establish a scientific advisory committee on ocean dumping of radioactive waste. The committee shall include, but not be limited to, scientists from the staffs of the department, the Department of Fish and Game, the California Coastal Commission, the Senate Office of Research, the Assembly Office of Research, the faculties of the University of California and the California State University, and private nonprofit marine resource and public policy organizations. The advisory committee shall meet at least once a year and design the procedures for the testing required by subdivision (b), subject to approval by the department. The advisory committee shall also analyze the results of the monitoring conducted pursuant to subdivision (a) and the testing conducted pursuant to subdivision

77000

TOCHTERMAN EXHIBIT A, Page 7

4191-0013

OFFICE OF THE GOVERNOR                          RELEASE:   Immediate
Sacramento, CA  95814
Kevin Brett, Press Secretary                    #707
Donna Lucas, Deputy Press Secretary
916/445-4571        9-21-87

    Governor George Deukmejian today signed legislation
regulating so-called "slate mailers" to provide full disclosure to
the public about slate mailing firms.

    "This `truth in mailing' measure will help to reduce some of
the questionable tactics used by groups and individual candidates
that use slate mailers for political purposes," the governor said.

    SB 1311 (Craven, R-Oceanside), requires groups or individuals
sending out slate mail to file campaign statements, and other
information with the Secretary of State concerning the
organization.  A slate mailer is defined as a mass mailing which
supports or opposes a total of four or more candidates or ballot
measures.

    The bill also requires that the mailing must include the name
of the sender, a notice indicating which candidates or
organizations have paid to appear on the mailer, and a notice that
the mailing was prepared by a slate mailer organization, not an
official party organization.  This information must be printed on
the mailer in no less than 8-point type.

    Individuals or groups found in violation of these provisions
are subject to the penalties provided for in the Political Reform
Act of 1974.

                        # # # # # #




SACRAMENTO ADDRESS
STATE CAPITOL
SACRAMENTO, CA 95814
PHONE (916) 445 3731

DISTRICT OFFICE
2121 PALOMAR AIRPORT RD
SUITE 100
CARLSBAD, CA 92008
PHONE (619) 438-3814
FROM ESCONDIDO
AREA 744-2223

# Senate
## California Legislature

**WILLIAM A. CRAVEN**
**SENATOR**
**38TH DISTRICT**

**VICE CHAIRMAN**
**COMMITTEE ON RULES**

September 15, 1987

Honorable George Deukmejian
Governor, State of California
State Capitol, First Floor

Dear Governor Deukmejian:

Over the last several years, campaign slate mailers and so-called voter guides have become important methods of communication in California elections.

Slate mailers also have become the subject of serious criticism. Senate Bill 1311 now on your desk is a first step toward addressing that problem by regulating slate mailers produced by various for-profit entities.

Specifically, the bill defines a "slate mailer organization" as an entity that receives $500 or more for producing slate mailers supporting or opposing four or more candidates or measures. Officeholders, candidates and their controlled committees, political parties and legislative caucuses are excluded from the definition and from the bill's provisions.

The bill requires slate mailer organizations to register and file periodic campaign disclosure statements in a manner similar to current requirements for campaign committees. More importantly, the bill requires slate mailers to include a prominent disclaimer identifying the name of the organization that produced the mailer and the fact that the organization is not an official political party. The disclaimer must further clarify which candidates and measures appearing on the mailer have or have not consented and paid to appear. The disclaimers also must include a statement that the appearance of a candidate or measure in the mailer does not necessarily imply endorsement of other candidates or measures in the mailer.

COMMITTEES      AGRICULTURE AND WATER RESOURCES      BUSINESS AND PROFESSIONS      ELECTIONS      LOCAL GOVERNMENT

TOCHTERMAN EXHIBIT A, Page 9

4191-0237

Honorable George Deukmejian
September 15, 1987
Page Two


This bill is sponsored by the Fair Political Practices Commission which conducted two extensive public hearings dealing with the problems of slate mailers. The bill has received bi-partisan support and has been carefully drafted to avoid any first amendment problems.

SB 1311 would prevent the obvious confusion that seems to have become an established tactic of the profit-making firms that produce these slate mailings.

I urge your signature on this most important issue.

Sincerely,

WILLIAM A. CRAVEN
Senator
38th District


WAC:sj:mc

# California
# Fair Political
# Practices Commission

John H. Larson
Chairman

*(916) 322-5901*

September 15, 1987

Honorable George Deukmejian
Governor
State of California
State Capitol
Sacramento, CA 95814
Attn:  Robert Williams

                                Re:   Senate Bill 1311

Dear Governor Deukmejian:

    I am writing to request that you sign Senate Bill 1311, authored by Senator William Craven.  This measure was introduced at the Commission's request.

    Senate Bill 1311 regulates political slate mailers produced by various profit-making entities.  The bill is the result of extensive hearings held by the Commission this past year.  You and many others wrote to the Commission urging introduction of legislation to resolve the problems with slate mailers.  The Commission believes that the legislation represents an important accomplishment toward political reform in this state.  It will provide for a more informed electorate.

    Critics of slate mailers, which include yourself and members of the Legislature on both sides of the aisle, have noted that some of these mailers, particularly those produced for profit:

1.  Mislead voters with mailers that appear to be official political party publications.

2.  Mislead voters by including the names of prominent public officials in the mailer when these officials have not consented to be included and when they may not support (and may even oppose) other candidates or ballot measures endorsed in the mailer.

3.  Confuse voters about the true identity of the person or group responsible for the mailer.

*428 J Street, Suite 800   ★   P.O. Box 807   ★   Sacramento CA   95804-0807*

TOCHTERMAN EXHIBIT A, Page 11

4191-0267

Governor George Deukmejian
September 15, 1987
Page 2

**To address these problems, SB 1311 does the following:**

1. Requires slate mailers to include a prominent disclaimer identifying the name of the organization that produced the mailer and the fact that the organization is not an official political party.  The disclaimer must further clarify which candidates and measures appearing on the mailer have authorized it and paid to appear.  The disclaimers also must include a statement that the appearance of a candidate or measure in the mailer does not necessarily imply endorsement of other candidates or measures in the mailer.

2. Defines a "slate mailer organization" as an entity that receives $500 or more for producing slate mailers supporting or opposing four or more candidates or measures.  Officeholders, candidates and their controlled committees, political parties and legislative caucuses are excluded from the definition and from the bill's provisions.

3. Requires slate mailer organizations to register and file periodic campaign disclosure statements in a manner similar to current requirements for campaign committees.

Again, on behalf of the Commission, I urge that you sign SB 1311.

Sincerely,

John H. Larson
Chairman

cc:  Senator William Craven

REL:JHL:jaj

SENATE ELECTIONS COMMITTEE                                    SB 1311
Senator Milton Marks, Chair                   Hearing date:  6/3/87

SB 1311 (CRAVEN), AS AMENDED 6/1/87                      FISCAL: YES

SUBJECT:

Political Reform Act: slate mailers.


EXISTING LAW

Under the campaign reporting requirements of the Political Reform
Act candidates and committees who produce slate mailers, or have
paid to be included in slate mailers, must disclose the payments
made or received in connection with the mailers.

Organizations which produce slate mailers for profit or
otherwise, but do not qualify as a committee under the Act's
definition, are not required to file financial disclosure
statements.

Slate mailers must also comply with the sender identification
requirements of the Act.  Specifically, the mailer must include
the name and address of the sender and, if sent by a controlled
committee, the name of the candidate or officeholder who controls
the committee.

Fair Political Practices Commission regulations require
identification of those candidates and statements of support or
opposition to ballot measures which have paid to appear on slate
mailers.


PROPOSED LAW:

This bill would impose disclosure requirements for slate mailer
organizations, as defined, and require mailers produced by such
organizations to include a specified notice identifying the
sender and their relationship with the candidates and ballot
measures listed thereon.

Definitions

"Slate mailer" means a mass mailing which supports or opposes a
total of four or more candidates or ballot measures.

"Slate mailer organization" means any person who directly or indirectly does the following:

° Is involved with the production of one or more slate mailers and exercises control over the selection of the candidates and measures to be supported or opposed thereon.

° Receives or is promised $500 or more in a calendar year for the production of one or more slate mailers.

For the purposes of this bill "slate mailer organization" does not include:

° A candidate or officeholder or their controlled committees.

° An official committee of any political party.

° A legislative caucus committee.

° A committee primarily formed to support or oppose a candidate, officeholder, or ballot measure.

## Reporting requirements

Slate mailer organizations would be required to file statements of organization and periodic financial disclosure statements that are similar to those that are required of other candidates and committees with a few notable differences.

The statement of organization, in addition to listing a treasurer and other principal officers, would have to identify each person with final decisionmaking authority as to which candidates or measures will be supported or opposed in the mailers.

Financial disclosure statements would be filed as follows:

° Semiannually in any year when $500 is received or spent in connection with the production of a slate mailer.

° Preelection statements during election years when $500 is received or spent in connection with the production of a slate mailer.

° Daily reports of income individually totaling $1,000 or more immediately prior to an election in the same manner that candidates and committees report their "late" contributions.

Financial disclosure statements would be required to include the following information:

° Specific identification of candidates or committees which are the source of receipts of $100 or more.

SB 1311
page 2

TOCHTERMAN EXHIBIT A, Page 14

4191-0030

° The cumulative total of receipts on behalf of, or in opposition to, any candidate or ballot measure.

° Identification of the candidates and ballot measures which are supported or opposed on a slate mailer for which no payment or compensation was received.

° Cumulative disbursements of $1,000 or more made directly or indirectly to any person listed on the statement of organization.

Slate mailer organization which also qualify under existing law as general purpose committees would also have to file the information required of such committees (e.g. identification of source and amount of all contributions and expenditures of $100 or more).

Slate mailer requirements

Each slate mailer produced by a slate mailer organization, as previously defined, would have to include the following:

° Identification and address of the slate mailer organization in 8-point type which contrasts with its background.

° A boxed notice in 8-point type which contrasts with its background, at the top of the front side or surface of each insert, which consists of the following statement:

**NOTICE TO VOTERS**

**THIS DOCUMENT WAS PREPARED BY (Name of slate mailer organization), NOT AN OFFICIAL PARTY ORGANIZATION Appearance in this mailer does not necessarily imply endorsement of others in this mailer.  Appearance is paid for and authorized by each candidate and ballot measure which is designated by an \*.**

° The \* designation in the notices must be in the same type size and color of the name of the candidates or ballot measures that they appear next to and appear next to the name of the candidate or ballot measure where ever it appears in the slate mailer.

Enforcement

The Fair Political Practices Commission would be charged with enforcement of the provisions of this bill and would be able to levy specified fines for violations.

SB 1311
page 3

TOCHTERMAN EXHIBIT A, Page 15

4191-0031

## COMMENTS:

1. According to the sponsors, the purpose of this bill is to address concerns and complaints regarding the practices of professional slate mailer organizations.  The FPPC recently held two public hearings on this issue at which the following recurring complaints were made:

   ° Slate mailers may be designed to appear to represent political party endorsements when in fact the mailer has no official party sanction.

   ° The various candidates and issues placed on the mailer appear to be endorsing one another, although they may have been placed on the mailer without consultation or consent.

   ° The fact that candidates or ballot measure committees have paid to be included in a slate mailer is not clear to the voters who receive the slate mailer.

   ° Slate mailers may be designed to hide the identity of the sender or to disguise the fact that some candidates or measures paid to be included on the mailer while others were included free of charge.

   ° Slate mailer organizations should be subject to campaign disclosure, so that the public will know the costs involved and who benefited.

2. Under this bill, a intentionally misleading slate mailer could be produced and distributed by a candidate or ballot measure campaign committee but not by a slate mailer organization, as defined.  Is this equitable?

3. It is conceivable that a local Democratic or Republican club which raises $500 to produce a slate mailer would be subject to the reporting and disclosure requirements within this bill. Was this the author's intent?


## POSITIONS:

Sponsor: Fair Political Practices Commission.

Support: Unknown.

Opposition: Unknown.


Darren Chesin/T.A Hodson
5/29/87

SB 1311
page 4

TOCHTERMAN EXHIBIT A, Page 16

4191-0032

Date of Hearing:  August 19, 1987                                      <u>SB 1311</u>

ASSEMBLY COMMITTEE ON ELECTIONS, REAPPORTIONMENT AND CONSTITUTIONAL AMENDMENTS
Peter Chacon, Chairman


SB 1311 (Craven) - As Amended:  June 10, 1987


ASSEMBLY ACTIONS:

| COMMITTEE | E.R. & C.A. | VOTE | COMMITTEE | VOTE |
|-----------|-------------|------|-----------|------|

Ayes:                                          Ayes:


Nays:                                          Nays:


<u>PRIOR ACTION</u>

Senate Elections Committee (Ayes 4. Noes 0.)
Senate Floor (Ayes 35. Noes 0.)
Assembly Committee on Elections, Reapportionment and Constitutional
  Amendments FAILED PASSAGE (Ayes 5. Noes 2.)  Reconsideration
  granted. (Ayes 6. Noes 0.)

<u>SUBJECT</u>

Political Reform Act:  Slate Mailers

<u>DIGEST</u>

<u>Current law</u>, the Political Reform Act, requires candidates and committees who
produce slate mailers, or who have paid to be included in slate mailers, to
disclose the payments made or received in connection with the mailers.

<u>Current law</u> does not require an organization which produce slate mailers for
profit or otherwise, and  which does not qualify as a committee under the Act's
definition, to file disclosure statements.

<u>Current law</u> requires slate mailers to comply with the sender identification
requirements of the Act.  The mailer must include the name and address of the
sender and, if sent by a controlled committee, the name of the candidate or
officeholder who controls the committee.

Current Fair Political Practices Commission regulations require advice is that
slate mailers should include identification of those candidates and committees
in of support or opposition to ballot measures which have paid to appear on the
mailers.  This is not a legal requirement.


                                                         - continued -

                                                         <u>SB 1311</u>


TOCHTERMAN EXHIBIT A, Page 17

**This bill** defines "slate mailers" and "slate mailer organizations," and impose reporting and disclosure requirements, as follows:

1) <u>Definitions</u>

"Slate mailer" means a mass mailing which supports or opposes a total of four or more candidates or ballot measures.

"Slate mailer organization" means any person who directly or indirectly does both of the following:

-- Is involved with the production of one or more slate mailers and exercises control over the selection of the candidates and measures to be supported or opposed thereon.

-- Receives or is promised $500 or more in a calendar year for the production of one or more slate mailers.

"Slate mailer organization" does <u>not</u> include:

-- A candidate or officeholder, or a candidate's controlled committee.

-- An official committee of any political party.

-- A legislative caucus committee.

-- A committee primarily formed to support or oppose a candidate, officeholder, or ballot measure.

2) <u>Reporting requirements</u>

Slate mailer organizations would be required to file statements of organization and periodic financial disclosure statements that are similar to those that are required of other candidates and committees with a few notable differences.

The statement of organization, in addition to listing a treasurer and other principal officers, would have to identify each person with final decisionmaking authority as to which candidates or measures will be supported or opposed in the mailers.

Financial disclosure statements would be filed as follows:

-- Semiannually in any year in which $500 is received or spent in connection with the production of slate mailers.

- continued -

TOCHTERMAN EXHIBIT A, Page 18

4191-0181

-- Preelection statements during election years in which $500 is received or spent in connection with the production of a slate mailer.

-- Daily reports of payments of $2,500 or more received after the closing date for the last preelection statement, in the same manner that candidates and committees report their "late" contributions.

Financial disclosure statements would be required to include the following information:

-- Identification of candidates or committees which are the source of receipts of $100 or more.

-- The cumulative total of receipts on behalf of, or in opposition to, any candidate or ballot measure.

-- Identification of the candidates and ballot measures which are supported or opposed on a slate mailer for which no payment or compensation was received.

-- Cumulative disbursements of $1,000 or more made directly or indirectly to any person listed on the statement of organization.

Slate mailer organization which qualify as committees under existing law would also have to file the information required of such committees (e.g., identification of source and amount of all contributions and expenditures of $100 or more).

4)  Slate mailer requirements

Each slate mailer produced by a slate mailer organization would have to include the following:

-- Identification and address of the slate mailer organization in 8-point type which contrasts with its background.

-- A boxed notice in 8-point type which contrasts with its background, at the top or bottom of the front side or surface of each insert, which consists of the following statement:

NOTICE TO VOTERS

THIS DOCUMENT WAS PREPARED BY (Name of slate mailer organization), NOT AN OFFICIAL PARTY ORGANIZATION Appearance in this mailer does not necessarily imply endorsement of others in this mailer. Appearance is paid for and authorized by each candidate and ballot

- continued -

TOCHTERMAN EXHIBIT A, Page 19

measure which is designated by an *.

5)  Enforcement

The Fair Political Practices Commission would be charged with enforcement of the provisions of this bill and would be able to levy specified fines for violations.


FISCAL EFFECT

Yes

COMMENTS

1)  According to the sponsors, the purpose of this bill is to address concerns and complaints regarding the practices of professional slate mailer organizations.  The FPPC recently held two public hearings on this issue at which the following complaints were made:

a)  Slate mailers may be designed to appear to represent political party endorsements when in fact the mailer has no official party sanction.

b)  The various candidates and issues placed on the mailer appear to be endorsing one another, when they may not even know who else is on the mailer.

c)  The fact that candidates or ballot measure committees have paid to be included in a slate mailer is not always clear to the voters who receive the slate mailer.

d)  Slate mailers may be designed to hide the identity of the sender or to disguise the fact that some candidates or measures paid to be included on the mailer while others were included free of charge.

e)  If slate mailer organizations are not subject to campaign disclosure, that the public cannot know the costs involved and who benefited.

2)  This bill only applies to slate mailers sent by slate mailing organizations.  It would not apply to mailers sent by candidates, candidates' controlled committees, parties, caucuses, or ballot measure committees.


- continued -

4191-0183

SB 1311
Page 5

POSITIONS

Sponsor: Fair Political Practices Commission

Support: Unknown

Opposition: Unknown

Barbara Milman
322-5249
erca

SB 1311
Page 5

TOCHTERMAN EXHIBIT A, Page 21

4191-0184



## SENATOR

*Bill Craven*

### 38th Senate District

**Sacramento**
State Capitol, Room 3070, Sacramento, CA 95814 • (916) 445-3731

**District**
2121 Palomar Airport Road, Suite 100, Carlsbad, CA 92008 • (619) 438-3814

FOR IMMEDIATE RELEASE                    CONTACT: SCOTT JOHNSON
March 10, 1987                                    916/445-3731

### SENATOR CRAVEN AUTHORS LEGISLATION TO REMEDY ABUSES OF CAMPAIGN "SLATE MAILERS"

Senator William Craven (R-Oceanside) announced today that he will author legislation to crack down on campaign "slate mailers" that confuse and mislead voters.

"During the 1986 elections," said Craven, "there were numerous complaints about slate mailers and voter guides that endorse several candidates and ballot measures. Although many slate mailers are produced for profit by firms, these mailers often appear to be official political party publications."

In addition, slate mailers often include pictures and names of prominent public officials who have not consented to appear on the mailings. "This practice," said Craven, "misleads voters into thinking that the mailers' recommendations are endorsed by these officials when, in fact, the officials may actually oppose the recommendations!"

"Slate mailers have become an important method of communication in California elections. Unfortunately, many of

- More -

TOCHTERMAN EXHIBIT A, Page 22

4191-0240

these mailings are deceptive.  My legislation, Senate Bill 1311, will correct the worst abuses and help voters evaluate candidates and issues prior to making decisions at the polls."

Senate Bill 1311 will require slate mailers to clearly identify the name of the firm producing the mailer and the fact that it is not an official political party publication.  In addition, slate mailers would be required to specifically identify whether or not each candidate or ballot measure included in the mailer has consented or paid to be included.

Senate Bill 1311 also will require slate mailer firms to file campaign statements disclosing their receipts and expenditures, similar to the statements currently filed by candidates and campaign committees.

Violations of the requirements of SB 1311 could result in fines up to $6,000 per violation, which is three times the normal fines for other violations of campaign disclosure laws.

Senate Bill 1311 is based on recommendations of the Fair Political Practices Commission which conducted extensive public hearings dealing with the abuses of slate mailers.

# # #

TOCHTERMAN EXHIBIT A, Page 23

4191-0241

State of California

# M e m o r a n d u m

To : Chairman Larson, Commissioners Lee,        Date : December 1, 1986
      Lemons, Montgomery and Roden


From : **FAIR POLITICAL PRACTICES COMMISSION**
       Kathryn E. Donovan and Robert E. Leidigh, Legal Division

Subject : Slate Mailer Hearing


Purpose of the Hearing

     The first of two Commission hearings on the subject of
slate mailers is scheduled for December 9, 1986.  The primary
purpose of this first hearing is to provide a forum for
candidates, officeholders, and other interested persons to air
their views about the use and misuse of slate mailers in recent
elections.  At the second hearing, which is scheduled for
February 10, 1986, in San Francisco, we plan to focus primarily
on proposed solutions to the problems presented at the December
hearing.

Persons Invited to Testify

     For the December meeting, we have invited candidates for
statewide office from the last primary and general elections,
legislators and other statewide officeholders, Court of Appeal
justices who were targeted in a slate mailer, representatives
of political parties and public interest groups, and political
consultants.  Examples of the invitations are attached.
Representatives of slate mailer organizations have also been
invited, although we have tried to schedule their testimony for
the February hearing.  A list of witnesses will be prepared for
the Commission hearing.  Copies of written material we have
received to date are attached.

Background:  1982 Staff Report

     For background information on slate mailers, we have
attached a copy of the Staff Report and Recommendations on
Slate Mailings from August 1982 and copies of recent newspaper
articles about slate mailers.  The 1982 Staff Report provides a
thorough discussion of slate mailer operations, the laws
governing slate mailers, and the use and misuse of slate
mailers.  Some of the information in the 1982 Staff Report has
changed slightly during the last four years.  For example, the
1982 Staff Report describes B.A.D. Campaigns as a relatively

Chairman Larson, Commissioners Lee,
  Lemons, Montgomery and Roden
December 1, 1986
Page 2

new slate mailer organization primarily active in West Los
Angeles.  B.A.D. Campaigns is now well established and is
active statewide.

This memorandum will first briefly describe the types of
complaints we have received concerning the use of slate mailers
in recent elections.  The memorandum will then summarize the
Commission's current role in regulating slate mailers and
discuss possible changes in these requirements.

## COMPLAINTS ABOUT SLATE MAILERS

### Recurring Complaints

Recurring issues concerning the use of slate mailers
include:

- Slate mailers may be designed to appear to contain
  political party endorsements when in fact the mailer has
  no official party sanction.

- The various candidates and issues placed on the mailer
  appear to be endorsing one another, although they may
  have been placed on the mailer without consultation or
  consent.

- The fact that candidates or ballot measure committees
  have paid to be included in a slate mailer is not clear
  to the voters who receive the slate mailer.

- Slate mailers may be "targeted" to different groups of
  voters so that the same candidate may be presented with
  Republicans on one slate and Democrats on another, when
  both slates are produced by the same slate mailer entity.

- Slate mailers may be designed to hide the identity of the
  sender or to disguise the fact that some candidates or
  measures paid to be included on the mailer while others
  were included free of charge.

- Slate mailer organizations should be subject to campaign
  disclosure, so that the public will know the costs
  involved and who is benefited.

These issues are discussed in detail in the attached 1982 Staff
Report.

Chairman Larson, Commissioners Lee,
  Lemons, Montgomery and Roden
December 1, 1986
Page 3

## The Republic Media Group Mailer

Most of the recent complaints we have received concern the
slate mailer sent by Republic Media Group during the June
primary election, a copy of which is attached.  This slate
mailer, and its effect, was described by syndicated columnist
Dan Walters, as follows:

> The mailer, which went to 2.4 million Republican
> households in 19 counties, endorsed all of the
> Republican incumbents, such as Gov. Deukmejian, but
> for fees, Republicans in contested primaries could
> also gain what appeared to be an "endorsement" of an
> official party organization.

> Bruce Gleason, a little-known San Fernando Valley
> attorney, paid the sponsors $2,500 to have his name
> placed on the mailer and that's why he won the GOP
> nomination for attorney general, although he has no
> chance of unseating Democratic incumbent John Van
> de Kamp.

> Rep. Ed Zschau, then locked in a tight U.S.
> Senate primary contest, also paid to have his name
> placed on the mailer and he, too, won.

> One of the other "endorsements" on the mailer was
> a "no" vote on Proposition 51, even though virtually
> every prominent Republican in the state, including
> Deukmejian, had asked for a "yes" vote on the measure
> dealing with liability judgments.  The mailer clearly
> made it appear as if Deukmejian was asking for a "no"
> vote -- which was precisely what those who paid nearly
> a quarter-million dollars for that inclusion wanted.

> Deukmejian was outraged at the mailer that
> purported to be "your Republican team '86" and linked
> his name with opposition to Proposition 51.  He and
> other Republicans tried to get the mailer canceled, to
> no avail.

> > Sacramento Bee, October 20, 1986,
> > part 1, p.3, col. 1.

## Complaints About the Mailer

The Republic Media Group slate mailer exemplifies at least
two of the recurring issues surrounding the use of slate

TOCHTERMAN EXHIBIT A, Page 26

Chairman Larson, Commissioners Lee,
  Lemons, Montgomery and Roden
December 1, 1986
Page 4


mailers.  The first issue is that slate mailers may be designed
so as to appear to contain party endorsements when in fact the
slate mailer has no actual party sanction.  The second issue is
that the various candidates and measures which are placed on a
slate mailer appear to be endorsing one another, although in
reality they may have been placed on the mailer without
consultation or consent.

Legal Challenge to the Mailer:  Apparent Endorsement by
  Political Party in Primary

     One of the complaints about the Republic Media Group slate
mailer is that it violated Elections Code Section 11703, which
prohibits the endorsement of candidates in a direct primary
election by a group which uses as a part of its name the name
of a political party or a derivative thereof <u>unless</u> the
endorsement contains a disclaimer that the endorsement is not
from an official party.<u>1/</u>  Elections Code Section 11703 is not
part of the Political Reform Act, and the Commission has no
authority to enforce compliance with that disclaimer
requirement.  Litigation brought by the California Republican
Party and others to enforce Elections Code Section 11703 is now
pending against Republic Media Group as a result of its slate
mailer.  The attorneys for both parties to that lawsuit have
expressed an interest in testifying at the December hearing.
Charles H. Bell, Jr., of Nielsen, Hodgson, Parrinello and
Mueller is representing the California Republican Party.
Joseph Remcho, of Remcho, Johansen and Purcell is representing
Republic Media Group.


REGULATION OF SLATE MAILERS
AND POSSIBLE CHANGES

     Currently, the Commission regulates slate mailers in two
ways.  First, the person sending the slate mailer may have

---

     <u>1/</u>  The disclaimer required by Elections Code Section 11703
also requires a statement that official political parties are
prohibited from endorsing or opposing candidates in primary
elections.  (<u>See</u>, Elections Code Section 11702.)  The Ninth
U.S. Circuit Court of Appeal has ruled that the prohibition on
political party endorsements is unconstitutional.  <u>San
Francisco County Democratic Central Committee</u> v. <u>Eu</u>, (9th Cir.,
1986) 792 F.2d 802.

TOCHTERMAN EXHIBIT A, Page 27

Chairman Larson, Commissioners Lee,
  Lemons, Montgomery and Roden
December 1, 1986
Page 5

responsibilities under the campaign reporting requirements of
the Act.  Secondly, the person sending the slate mailer must
comply with the sender identification requirements of the Act.

Reporting.  Under the campaign reporting provisions of the
Act, any person or entity who qualifies as a "committee"2/ must
file appropriate campaign statements disclosing the source of
all contributions of $100 or more, the recipient of all
expenditures of $100 or more, and the beneficiaries of all
"independent expenditures" of $100 or more.  A state or local
candidate or committee who prepares and sends a slate mailer is
subject to these reporting requirements.

The Commission has consistently advised independent
contractors who are in the business of sending slate mailers
that they generally do not qualify as "committees" and have no
campaign disclosure responsibilities under the Act solely as a
result of their slate mailer business.  These slate mailer
organizations are only required to furnish paying candidates
and committees with information regarding expenditures made in
connection with the mailer.  The paying candidates and
committees must, in turn, report those expenditures on their
campaign statements.

Sender Identification.  The sender identification
requirements of the Act (Section 84305) apply to candidates and
committees who send slate mailers and to independent contractor
slate mailer organizations which receive payments from
candidates or committees for inclusion in a slate mailer.  If a
candidate or committee pays for a slate mailer which is sent to
200 or more different persons in a calendar month, the
candidate or committee must be identified as the sender of the
mailer on the outside and inside of the mailer.

_____

2/  To qualify as a "committee," a person or entity must do
one of the following:

        (a)  Receive contributions of $500 or more in a
calendar year;

        (b)  Make independent expenditures of $500 or
more in a calendar year; or

        (c)  Make contributions totaling $10,000 or more
in a calendar year.

                        Section 82013.

Chairman Larson, Commissioners Lee,
  Lemons, Montgomery and Roden
December 1, 1986
Page 6


     Independent contractor slate mailer organizations which
receive payments from candidates included in a slate mailer
must also provide certain information, on the mailer itself,
concerning the sender of the mailer and who paid for it.
Specific requirements are:

     1.  On the inside and outside of the mailer must appear a
statement that the mailer is published by the slate mailer
organization.

     2.  The outside of the mailer must include a statement that
the mailer is paid for by the candidates or committees whose
names appear inside.

     3.  Inside, the names of the paying candidates and
committees must be marked with an asterisk, and it must be
stated that the mailer was sent or paid for by the candidates
and committees that are so marked.

     One of the written comments we received, a letter from
State Board of Equalization member Richard Nevins, emphasizes
the need to require information explaining who chooses the
people endorsed in a mailer and who has paid for the mailer.

     Regulation of Content.  The Act does not expressly regulate
the content of slate mailers or many of the aspects of slate
mailers which are claimed to be misleading.  There are statutes
in the Elections Code which require disclaimers on mailings
from groups using the name of a political party or a derivative
thereof.  (Elections Code Sections 11703 and 11704.)  However,
there are no statutes which prohibit any person or entity from
including the name of a candidate in a slate mailer over the
objections of the candidate.  Such a prohibition raises
constitutional questions.  (See, Buckley v. Valeo (1976) 96
S.Ct. 612, 648).

     Federal Law.  Recent developments in federal elections law
have drawn attention to the Commission's advice to independent
contractor slate mailer organizations regarding their lack of
campaign disclosure obligations under state law.  In Federal
Election Commission v. Californians for Democratic
Representation, No. CV 85-2086 (C.D. Cal., Jan. 9, 1986), an
independent contractor slate mailer organization (B.A.D.
Campaigns) was held to have qualified as a political committee
under federal law as a result of listing federal candidates in
its slate mailer free of charge.  The Federal District Court
held that, under federal law, the slate mailer organization had
made reportable expenditures by providing the candidates with
free space in the slate mailer.  It follows that providing a

Chairman Larson, Commissioners Lee,
  Lemons, Montgomery and Roden
December 1, 1986
Page 7

candidate with free space in a slate mailer could be considered a contribution to the candidate under federal law if the slate mailer organization acts in consultation with or in coordination with the candidate. The court also concluded that payments received by the slate mailer organization from candidates who purchase space in the slate mailer are <u>not</u> considered contributions to the slate mailer organization under federal law.

The decision under federal law is not determinative of similar questions under state law. However, the advantages to changing the Commission's interpretation of state law in light of the recent federal interpretation should be explored. Such a change might reduce confusion for slate mailer organizations subject to both federal and state laws. However, the effects of any change on state and local candidates who are subject only to state law must also be considered.

KED:plh

# Candidates buy place on slates

**By Vicki Haddock**
*The Tribune*

Eastbay Democrats are receiving "voter guides" in their mailboxes that may appear to feature official Democratic Party endorsements. They don't.

Listed Democratic candidates often spend between $1,000 and $50,000 to buy onto the slates, while some unlisted Democratic candidates denounce them as a "sham."

Furthermore, the biggest local Democratic slate is touting Alameda County sheriff's candidate Charlie Plummer — a Republican.

Those slates disclose in small print that they are a for-sale service provided by Los Angeles political consultants Michael Berman and Carl D'Agostino, who have nicknamed themselves BAD Campaigns.

This weekend they are sending 7 million copies of slates throughout California in possibly the most sophisticated political slate mail operation in the country.

By no means do Berman-D'Agostino publish the only Eastbay slates — they also are issued by local clubs, Oakland Rep. Ron Dellums' committee and Assembly Speaker Willie Brown.

In the Fremont area the Brown slate is being lambasted by young agents by Assembly-man Alister McAlister and others who say it indirectly implies that unendorsed candidates are disciples of fringe political guru Lyndon LaRouche.

But the Berman-D'Agostino slate is most controversial because it is apparently the only slate that sells its endorsements.

"That's the difference. You cannot buy your way onto our mailer," Dellums said. "We don't try to be deceptive about what it is . . . In my humble opinion, the Berman slate gives the impression that it is official and came from the Democratic Party."

Berman disagrees: "I think people recognize our slate for what it is — the unofficial recommendations of a coalition of Democrats."

"What disturbs me a great deal is that the slate has nothing to do with the Democratic Party. It's strictly a business," said a Democratic Party Chairman Betty Smith. "The voter, I think, is confused."

Among Berman and D'Agostino's old friends is Don Perata, who is a candidate for Alameda County supervisor.

He said he is paying $12,000 to get on their slate. His wife is helping run Plummer's campaign, and Perata said he also recommended BAD sell slate space to Plummer.

"Comparing purchasing a slate endorsement to buying a billboard ad or T.V. commercial, Perata explained "it's just one component of my campaign."

He stressed that he does not believe the slates attempt to mislead voters. While they include the names of prominent state Democrats for free to give the slate more respectability, there are asterisks beside the names of candidates who paid for the endorsement.

Those include Union City Assembly candidate Delaine Eastin, Alameda County Superior Court judge candidate Rod Dun-can and state controller candidate Gray Davis, who hired political consultants Berman and D'Agostino to help run his campaign.

Several locals who lost elections in 1982 or 1984 say they were defeated because they lacked the political contacts, the money or the moral willingness to buy onto the BAD slates.

Those include Oakland City Council member Marge Gibson, who ran unsuccessfully for Alameda County supervisor, and Paul Bernhardt, who lost a bid for Hayward-San Leandro municipal judge.

And when Marshall Zaidell lost the slate endorsement and his Alameda County assessor's bid to Don Kroger in 1982, the Zaidell campaign manager complained it was because they could not afford Berman's asking price of $30,000. And both were Republicans.

Although costs to appear on a BAD slate vary depending on the race, prominence of the endorsement and other factors, it averages around $10,000 for a local race.

Statewide complaints prompted a 1982 investigation by the Fair Political Practices Commission, which concluded that although the slates could be perceived as deceptive and some candidates accused them of selling out to the highest bidder, slate operators generally did abide by regulations.

Large-scale slates, the FPPC predicted, were likely to grow "more powerful and more potentially lucrative" in the 1980s.

Shortly thereafter, Berman-D'Agostino went statewide.

So why are these unofficial slates embellished with donkeys, stars, phrases like "Vote Democratic" and "Take This To The Polls With You," and portraits of FDR and JFK?

Because, said Common Cause director Walter Zelman, if everyone knew the slates were merely the preferences of a couple of guys in Los Angeles, they "would be worth no more than a pitcher of warm spit."

Private slates thrive in a pow-er vacuum: California law prohibits political parties from endorsing in partisan primaries. Betty Smith said the only answer is to give parties their full endorsing rights once and for all.

Meanwhile, charges that endorsements go to the highest bidder evokes vehement denials from Berman.

He cited examples where BAD might have collected lots of money to endorse Las Positas development north of Livermore, but Berman said they decided not to because of an impassioned appeal from Las Positas opponent Assemblyman Tom Bates.

How does the duo determine whom to endorse for county, hospital board and central committee seats when they are 400 miles away?

Berman admitted unfamiliarity with many such races and said BAD follows the recommendations of local Democratic associates.

In the Eastbay that means longtime ally state Sen. Bill Lockyer of Hayward, who acted as a local broker for three county candidates including supervisorial hopeful Bob Knox in 1984. Indeed Lockyer bargained D'Agostino down saying "I deserved a discount for volume."

It also includes most assemblymen in Contra Costa and Alameda counties.

Although county Democrats are split in the District 3 supervisor's race between Perata and Democrat Sandre Swanson, Berman's decision was easy.

"I don't believe if Sandre Swanson offered us a million dollars it would have mattered," Berman said. "We've been friends of Don Perata for a long, long time."

Berman said he understood the sheriff's race was not strongly contested — he gets an argument there from supporters of Democratic candidates Ron Cain and Dennis Jeffery — and added that such endorsements for Republicans, while rare, are justified because the races are non-partisan.

The mailer also expressly states that Plummer is a Republican, but adds he is "best qualified."

"My only complaint is that they went for a Republican when there are good Democrats in the race," said Mark Stein, who chairs the Alameda County Democratic Central Committee and is a strong supporter of Jeffery.

Dellums's political community advisory group is mailing its slate to Democrats in his district listing candidates who received a 60 percent vote of support from the group.

The slate touts Dellums's aide Swanson for supervisor, Cain for sheriff, Davis for state controller and Horace Wheatley, running against Duncan, for Superior Court judge. Davis and Wheatley contributed to Swanson's campaign, but Swanson said those contributions did not in any way pay for the Dellums slate.

Californians may be seeing more mailers. San Francisco political consultant Clint Reilly, whose clients frequently are not endorsed on the mailers of competing political consultants Berman and D'Agostino, said he may launch his own slates.

There is money to be made. State records show that in 1982 the BAD slate collected $1.6 million for slate endorsements and paid Berman and D'Agostino consulting fees and overhead of $470,000. More recent information is not public because the FPPC ruled they were simply vendors selling a service.

TRIBUNE
Sun. June 1. 1986.

TOCHTERMAN EXHIBIT A, Page 31

4191-0162

# Curb, Richardson wage a GOP war without fireworks

**By Linda Breakstone**
*Herald politics writer*

Given the personalities and track records of the two candidates, the race between Mike Curb and H.L. Richardson for the Republican lieutenant governor nomination was expected to be intense and volatile.

Instead, it has been a rather tepid affair — the bloody campaign war that wasn't.

The main reason is that Curb, a recording industry executive and a former lieutenant governor, has waged his comeback bid almost exclusively with television commercials. Gone are the combative actions and ill-advised remarks that marked his 1979-83 term in office and his failed bid for governor in the 1982 GOP primary.

Richardson, a veteran state senator from Glendora known for his conservative philosophy and acerbic style, has tried unsuccessfully to draw Curb into hand-to-hand combat. He has repeatedly challenged Curb to a debate and chided him for hiding from the press, the public and the issues.

Curb wasn't about to take the bait. "I have to fight myself" to keep from responding, he conceded. But he held back.

Without any fireworks in the race, both men have focused on wrapping themselves in the mantle of Republican Gov. George Deukmejian. Each has sought to persuade GOP voters that he is the one most closely linked and best suited to run with Deukmejian.

In the process, Curb and Richardson have studiously ignored the irony of their pitches. Just four years ago, Curb — with Richardson as an ally — was battling Deukmejian for the gubernatorial nomination.

The man who Curb, 41, and Richardson, 58, want to beat in November — incumbent Lt. Gov. Leo McCarthy — faces no challenge for the Democratic nomination. So McCarthy, 55, has enjoyed the luxury of marshaling his forces and stockpiling his campaign cash for the fall faceoff.

Two weeks ago, it appeared the Republican race might live up to its advance billing. Richardson, frustrated by his inability to draw Curb out, was about to launch tough television ads against him. Then, an unexpected shift in polling data gave Richardson second thoughts about his "attack" strategy.

A California Poll released in mid-May showed Richardson trailing Curb by only 6 percentage points, down from the 16-point gap registered in March.

"If my strategy is working, why change it?" asked Richardson, putting his planned ads on ice.

Now, Richardson firmly believes that the low voter turnout expected in Tuesday's primary will be his winning ticket.

Mark Barnes, Richardson's advertising consultant, said, "Historically, the lower the turnout, the more conservative and the more informed the voter. This is our strength. To know Curb is not to like him."

Curb consistently has registered a high unfavorable rating among GOP voters in the California Poll. That rating was partly responsible for Curb's tactical decision to keep a low personal profile in the race.

Meanwhile, Curb's media campaign has intensified in the last few days. His traditional strategy has been to close each contest with a final blitz of television ads. And this race is no different.

Curb campaign manager Fred Karger confirmed that the candidate will end up spending $300,000 on television commercials in the seven days before Tuesday's balloting. "I expect we'll outspend Richardson by at least 4 to 1," said Karger.

Richardson adviser Barnes was taken aback at the extent of Curb's last-minute media buys, acknowledging that his candidate reserved air time for only $95,000 worth of commercials during the same period.

In total, Curb's campaign will have spent $800,000 on television ads — twice Richardson's $400,000.

Curb also is counting on 2.4 million pieces of mail touting his candidacy that will be sent to Republican households before the election.

Curb paid $30,000 to be listed on the mailing, which also urges voters to oppose Proposition 51, the measure to amend California's "deep pockets" liability law.

Despite his appearance on the mailer, Curb has been a vocal supporter of Prop. 51. But Karger insisted there is no conflict in Curb's payment for inclusion on the mailer, noting there is a small disclaimer on the card pointing out that the politicians listed on it do not necessarily endorse one another or the initiative.

"We had some misgivings, as Curb has been blasting the deceitful commercials being used against Prop. 51," said Karger. "But (the mailer) is going to 2.4 million households, and that's a huge advantage for us. And we were not about to let a slate mailing go out with the governor's name on it without ours."

The mailer is using Deukmejian's name without his permission, and despite requests by Deukmejian's campaign to delete it. Deukmejian is a supporter of Prop. 51.

LA HERALD X

SUN. JUNE 1. 1986

TOCHTERMAN EXHIBIT A, Page 32

4191-0163

# The San Diego Union

Col. Ira C. Copley, 1864 - 1947
James S. Copley, 1916 - 1973

## Editorials/Opinion

Helen K. Copley, Publisher
Gerald L. Warren, Editor

Page B-10      *A Copley Newspaper*      Saturday, May 31, 1986

# Dirty politics



It's sleazy, slimy, and disreputable. It's misleading at best, deliberately dishonest at worst. And it's becoming an election-eve staple to the great detriment of a political system that rests on fairly contested elections.

It, of course, is the last-minute hit piece, the weekend-before-the-election attempt to hoodwink the electorate. A particularly odious example came to our attention yesterday.

Mailed to perhaps 2 million Republican households across California, this flyer closely resembled an official sample ballot of the kind that might be distributed by the local or state Republican party. The one we saw proclaimed "San Diego Republican Ticket" across the top. It carried a slate of GOP candidates beginning with Gov. Deukmejian. On the back, it urged "Vote Your Republican Team '86."

The fine print at the bottom indicated the purported sample ballot was produced by "Republic Media Group/Republican Ticket — An Unofficial Political Group." Unofficial was hardly the word. The actual producer was a Los Angeles political consulting firm operated not by Republicans, official or otherwise, but by Democrats.

What made the firm's purported Republican ballot especially noteworthy, and especially misleading, was its attempt to suggest that Republicans were opposing Proposition 51. In fact, most Republican candidates we've heard from, starting with Gov. Deukmejian, support Proposition 51, the desperately needed reform of California's deep-pockets liability law.

It was bad enough that the phony sample ballot implied that Republicans were officially opposing Proposition 51. More outrageous yet was the luridly worded disinformation about Proposition 51 on the reverse side of the purported sample ballot. This boilerplate began: "Republicans are fed up with liberals letting

the guilty off the hook. Just like murderers and rapists, toxic polluters who cause cancer MUST be ... punished." This litany of nonsense next suggested that passage of Proposition 51 would put more people on welfare.

Reportedly, the trial lawyers and others opposed to Proposition 51 put up a handsome sum to get their message on the mailer. We don't know whether they or the political consulting firm wrote the grotesque propaganda equating Proposition 51 with letting murderers and rapists off the hook. Either way, the language is a disgrace and an insult to intelligent voters.

The mailer itself, so carefully designed to suggest the imprimatur of the Republican party, is deliberately misleading and, accordingly, dishonest. Let voters beware. And let California's Fair Political Practices Commission take another look at these deceptive mailers, and at those who profit from these disreputable tactics.

---



B6  PRESS-TELEGRAM (AM/PM)/MONDAY, JUNE 6, 1986

# PRESS-TELEGRAM

604 Pine Avenue, Long Beach, California 90844 / Telephone 435-1161

**LARRY ALLISON**
Editor

**DANIEL H. RIDDER**
Publisher

**VANCE CAESAR**
General Manager

**JOHN J. FRIED**
Editorial Page Editor

**RICH ARCHBOLD**
Managing Editor

**DON OHL**
Associate Editor

# Distorting records of their opponents

**W**hen a candidate attributes questionable positions to an opponent, distortion may be at work.

One example is a mailer from Honest Republicans for Ron Batson. Sent to Republicans in the Long Beach's 1st Council District, it falsely alleges that Batson's opponent is endorsed by several controversial politicians.

Evan Braude denies he is supported by any of those listed: Mayor Tom Bradley, Assembly Speaker Willie Brown, and Assemblyman Tom Hayden and Hayden's wife, actress Jane Fonda.

Braude does have local union endorsements, as mentioned in

**Ethics**
★ ★ **Hotline** ★ ★

the flyer, but has taken no position on the retention of California State Supreme Court Justice Rose Bird or Proposition 51.

Another example is a flyer sent by Larry Ward, a 54th Assembly District candidate, falsely asserting that opponent Ed Walters opposes the death penalty.

Voters should use independent sources to make their own comparisons of each candidate's positions.

---

TOCHTERMAN EXHIBIT A, Page 33

4191-0164

# Oakland Tribune

**A-4**   *Wednesday, February 11, 1987*

# Election-slate mailers targeted

## FPPC seeks ways to eliminate political materials deception

**By Vicki Haddock**
*The Tribune*

SAN FRANCISCO — California can never wipe out election-slate mailers altogether, but the Fair Political Practices Commission is insisting the state try to keep them from being downright deceptive.

At a hearing yesterday, staff members of the FPPC and other witnesses gave the commission suggestions on how to clean up the mailers, which again uncorked controversy and left a host of people, from the Alameda County Democratic Central Committee to GOP Gov. Deukmejian, crying foul.

These computerized slates — usually spangled with stars and Democratic donkeys or Republican elephants — hit voters' mailboxes on Election Eve featuring photos and blurbs about candidates and ballot measures from the visible top state races down to the most obscure local trustee campaigns.

Although casual readers might mistake them for official Democratic or Republican party endorsements, the biggest slates are in fact published by a handful of unelected politicos who award slate space to friends, friends of friends, possibly even the highest bidder.

Several victorious Eastbay candidates have paid thousands of dollars for slate endorsements.

The bottom-line complaint, in the words of state Republican Party lawyer Charles Bell, is that slate mailers have prompted "a new era of political bosses ... slate-mail hucksters who are disdainful of principles or the law and delight in political trickery."

Not so says Michael Berman, who along with fellow Los Angeles political consultant Carl D'Agostino publishes state-of-the-art slates titled "Democratic voter guides."

With 7 million mailings in last year's primary, Berman has been quoted as saying the business grossed nearly $2 million in that election alone.

"But I think long and hard about what we do, and I take our responsibility seriously," he told The Tribune just before the election.

Indeed, Berman contended that slates are the most economical way for candidates to communicate with thousands of potential voters, and added that they are a guideline for inattentive voters who nonetheless share common principles. The duo drafted its slate after consulting local allies including many Eastbay assemblymen, Hayward Sen. Bill Lockyer and Alameda County Supervisor Don Perata.

Among the suggestions at yesterday's FPPC hearing were:

■ Requiring clearer, larger and more prominent disclaimers on both sides of mailers to emphasize they are not authorized by an official political party.

■ Forcing slate publishers to list on the documents how much candidates paid to secure endorsements — a plan the FPPC staff said would be too "confusing."

■ Mandating disclosure of candidates who did not agree to appear on the slate. Deukmejian, for example, was furious when his likeness appeared on a mysterious GOP mailer opposing a proposition he supported, and the Republican Party has taken its complaints over that mailer to court.

■ Treating free slate endorsements as contributions or independent expenditures on behalf of listed candidates.

The question remains whether such "reform" measures will effectively eliminate the potential for deception. Mailers currently do not claim to be party documents — they merely may create that impression, critics say.

"It's the inference that troubles me personally," said FPPC Chairman John Larson. "I don't know how we stop (that)."

More drastic proposals to ban for-profit slate mail ventures, prohibit endorsements without the candidates' permission. or forbid use of party symbols and logos could run afoul of First Amendment free speech guarantees.

TOCHTERMAN EXHIBIT A, Page 34

# GOP leaders denounce mailer opposing Prop. 51

By William H. Kossen
The Register

Sunday, June 1, 1986     The Orange County Register     B5

A group of Orange County Republican leaders expressed outrage Saturday at a mailer sent by the foes of Proposition 51, saying it falsely implied they were against the "deep-pockets" initiative and linked them to candidates they do not support.

"It's very deceptive, typical of last-minute desperation tactics," said state Sen. Marian Bergeson, R-Newport Beach. Her comments came at a news conference held to counter the effects of the mailer, which was delivered Thursday and Friday to more than 2 million homes statewide.

Also attending the conference at the Republican Central Committee headquarters in Orange were state Sen. Ed Royce, R-Santa Ana; Assemblyman Nolan Frizzelle, R-Huntington Beach; and U.S. Rep. Robert Badham, R-Newport Beach. Assemblyman Gil Ferguson, R-Newport Beach, sent a prepared statement denouncing the mailer as "slanderous."

The lawmakers are confident Prop. 51 still will pass, but said the mailer has confused many Republican voters and may cause some to vote against the initiative, which the state Republican party supports.

Prop. 51, backed by city and county officials and insurance companies, is touted as a way to reduce soaring liability insurance rates. It would limit liability for non-economic damages such as pain and suffering in lawsuits involving more than one defendant, restricting the defendants' monetary liability to their portion of the blame.

The mailer puts the measure in a bad light, saying, "Republicans are fed up with liberals letting the guilty off the hook. Just like murderers and rapists, toxic polluters who cause cancer must be held fully accountable and strictly punished."

The mailer includes a list of Republican candidates and ballot propositions for which recipients are urged to vote. That list includes Gov. George Deukmejian, whose name was used without his permission, prompting charges of shoddy ethics from the governor's campaign.

The governor's name was placed on the mailer without his consent, despite assurances it would not be used, said Larry Thomas, Deukmejian's campaign director.

Michael Mercier of the Republic Media Group in Huntington Beach, which composed the mailer, promised that Deukmejian's name would not appear, Thomas said.

Mercier, a Democratic campaign professional, said his mailer was within the law.

"Our intention was to carry a full ballot and contribute to this year's election, and that's all it is," he said.

In an effort to offset the mailer's effect, the campaign firm promoting Prop. 51 sent out a special mailing Friday to more than 150,000 Republican homes. The new mailing, designed to debunk the anti-Prop. 51 mailer, also contained endorsements of the initiative from Deukmejian and Republican U.S. Sen. Pete Wilson.

"We did as much as we could do in the little time that we had before Tuesday's election," said pro-Prop. 51 coordinator Jack McDowell.

Royce, whose name was used on the mailer without his permission, has asked the District Attorney's Office to investigate the possibility that the slate mailer may violate the state's Truth in Endorsement law directed against deceptive political practices.

**The Associated Press contributed to this report.**

TOCHTERMAN EXHIBIT A, Page 35

4191-0166

LA HERALD X

SUN. JUNE 1. 1986

E6   PRESS-TELEGRAM/SUNDAY, MARCH 22, 1987

# If you're looking for a political sure thing ...

By Tupper Hull
Herald staff writer

Don't be shocked Tuesday to find several candidates on your primary ballot running against Tom Bradley for the Democratic gubernatorial nomination, or a bunch of Republicans seeking their party's nod for attorney general.

With attention focused on the GOP battles for the U.S. Senate and lieutenant governor nominations, as well as primary fights in both parties for state controller, other statewide races have been overlooked.

That's partially because some incumbents escaped primary opposition. Democratic Attorney General John Van de Kamp is one. Democratic Secretary of State March Fong Eu is another.

Democratic Treasurer Jesse Unruh got the freest ride of all. He is unopposed in the primary and has no Republican opponent in the November election.

In the gubernatorial primaries, both Bradley and Republican Gov. George Deukmejian drew opponents. But none is given a chance of upsetting the pair.

Bradley's four opponents include Eileen Anderson of Beverly Hills, a singer and dancer; Hugh Bagely, a flea-market operator in Keyes who wants to annex Mexico; and Frank Thomas of Thousand Oaks, who wanted his occupation listed on the ballot as "senior citizen."

Bradley's top opponent is Charles Pineda Jr. of Sacramento, a state parole official.

Deukmejian faces H.R. "Bill" Clark, an electrical engineer and contractor from Saratoga.

Three Republicans are seeking the secretary of state nomination. Orange County Supervisor Bruce Nestande is favored. He faces Ralph Winkler, a retired Air Force major from Lakeside, and Michael Cyrus, a market analyst from Hawthorne.

Three Republicans also are seeking the nomination to run against Van de Kamp. They are Duncan James, a former Mendocino County district attorney, Bruce Gleason, a Pasadena lawyer, and Lawrence J. Straw Jr., a Los Angeles lawyer.

# The insidious mailers

## Curbing a wicked campaign practice.

In some elections in this state, so-called slate mailers are the most pernicious influence. Their power exceeds that of baby-kissing, campaign promises and last-minute smears.

The mailer may look like official endorsements of candidates or propositions by Republicans or Democrats. It isn't. Places on it are often paid for. And its endorsements may start, trickily, with the most popular candidates in the voter's party and move on to recommend obscure candidates from the rival party and candidates for non-partisan office.

This skulduggery often works. It's easy for any of us to glance at the slate mailer, discover (we think) that Our Party shares our view about who ought to be governor and U.S. senator, and move on to take the slate mailer's advice about who ought to be controller, superior court judge and county supervisor.

The First Amendment's guarantee of freedom of the press protects the slate mailers. But the Fair Political Practices Commission thinks it has a constitutional way to pull the mailers' fangs.

The FPPC would require each mailer to contain the sender's name and a statement disclaiming any official party connection — both in large type. It would also require the mailer to show which endorsements had been paid for. And the commission proposes that the companies that produce slate mailers be required to report campaign contributions and expenses.

The mailers would still thrive, but they wouldn't fool quite so many people. The Legislature should impose on mailers the requirements proposed by the Fair Political Practices Commission.

TOCHTERMAN EXHIBIT A, Page 36

# Political Slate Mailings Mix Issues and Business

**By KENNETH REICH,** *Times Staff Writer*

Gov. George Deukmejian, who has only token primary opposition, was outraged this past week when, without his consent, his name was put on a slate mailing that was also being used to oppose Proposition 51, the "deep-pockets" initiative that the governor strongly supports.

But a number of other Republicans who also support the initiative actually paid to get on the slate mailing, and seemed happy to be there—despite the slate's no-on-51 recommendation. These Republicans were in real primary contests, and they were more than willing to be on anything that was going to reach 2 million Republican households, especially if buying a spot on the mailer would keep their opponents off of it.

### Affordable Advertising

The situation points up one of the cardinal facts about slates, the mass mailings that promote a ballot-style list of preferred candidates and initiatives and that go out in virtually every election: It is hard for a candidate who has serious opposition to pass up a chance to buy a spot on them.

As Jerry Haleva, an aide to state Sen. Bill Campbell, a candidate for the GOP nomination for state controller, frankly conceded last week, "Campbell's on slates on both sides of 51. . . . The reality is that Bill Campbell's on any mailer with George Deukmejian's name on it that we can get on."

There is no way Campbell could afford to independently sponsor a mailing to 2 million households. The Campbell campaign would not say how much they had been asked to contribute to finance the mailing, but one of his primary opponents, Assemblyman Don Sebastiani, said he had been asked to pay $25,000 for a spot on the mailer. When he turned it down, the slate organizers went to Campbell.

Slate mailers may give the impression of ideological consistency, that they are sent out by people who really believe in the candidates and causes espoused. This is often not the case. Many slate mailers are simply business ventures. Positions on the mailers go to the highest bidders.

For instance, Michael Mercier and Jim Corey, the men who organized the slate mailing to the 2 million Republican households, reportedly first offered to sell the pro-51 campaigners space on the card for $110,000. If that solicitation had been accepted, Deukmejian—whose name was placed on the slate for free because it lent credibility—probably would have been happy because he supports Proposition 51.

But the pro-51 firm of Woodward & McDowell declined, and the slate organizers promptly went to the Berman-D'Agostino firm, coordinators of the campaign against the proposition, and this time their deal was accepted. In fact, the anti-51 campaigners were reportedly willing to pay $180,000 for such great access to Republican voters, and the mailing was expanded by nearly double. (In its final form, the largely Republican slate also endorsed several liberal judges who had paid to be included.)

### Causes Not Their Own

The episode points up how candidates can easily become enmeshed in slates with causes that are not their own. (The Mercier-Corey mailer did contain a disclaimer saying the candidates endorsed were not necessarily backing the initiative positions recommended, but it was in tiny print and vaguely worded.)

Candidates often cannot resist becoming involved in the big money advertising campaigns waged over controversial initiatives. In the case of Proposition 51, for instance, more than $10 million will be

**Please see MAILERS, Page 17**

**Continued from Page 3**

spent by the two sides. It was almost inevitable that some of the candidates would try, in some way, to latch on to the campaign mailings and commercials.

In the 51 campaign this phenomenon is most evident in the race for the Democratic nomination for state controller. One contender, Assemblyman Gray Davis, is closely aligned with Berman-D'Agostino and thereby is assured of being on every Democratic slate mailing they participate in that is opposed to the initiative, even if he is expected to make some financial contribution. A second candidate, Assemblyman Alister McAlister, free of any charge, has appeared on a television commercial produced by Woodward-McDowell as a spokesman for the pro-51 forces, thus giving himself massive television exposure as his own election approaches.

### Benefitting From Campaign

A few weeks ago, it appeared that state Sen. John Garamendi, the third candidate in this race, would not be getting any assistance in advertising his own campaign from either the pro or con sides of the 51 campaign.

But fortunately for Garamendi, his campaign manager, Clint Reilly, was also managing the reelection campaign of the state superintendent of public instruction, Bill Honig. Honig was a co-chairman of the campaign for 51 and was going to appear, free to himself, on a radio spot for the campaign.

Reilly managed to arrange for Garamendi to benefit from all the money put into the initiative too. He said he had persuaded Woodward-McDowell to buy one quarter of a four-page Garamendi brochure that went out last week to a million Democratic households. Without the pro-51 contribution, Garamendi would not have been able to afford such an extensive mailing.

### Controversial Terminology

Another beneficiary of the Proposition 51 campaign has been Atty. Gen. John Van de Kamp, who appeared on television commercials produced by Berman-D'Agostino that have been seen for weeks throughout the state.

Van de Kamp's commercials have landed him into controversy over some of the terminology he has employed, and he really doesn't need the exposure this year, having only nominal opposition for reelection. But it is widely believed that Van de Kamp intends to run for governor in 1990, and Michael Berman of Berman-D'Agostino reportedly remarked recently that the anti-51 commercials he had done were the opening shot in that campaign.

*JA Times  6-2-86*

TOCHTERMAN EXHIBIT A, Page 37

4191-0168

# Poll says candidates often alike

See Capitol Bureau

A majority of California voters saw few clear policy differences between Republican and Democratic candidates in the Nov. 4 state election, and a growing number of the electorate wants politicians to be subject to strict campaign-finance laws, according to a California Public Interest Poll released Tuesday.

The poll, which is a joint project of California Common Cause and the University of Southern California's Institute of Politics and Government, also found nearly half of those surveyed believed that a candidate's party affiliation was of little or no importance.

Sponsors of the poll said a telephone sampling of 500 adults, not all of whom voted, was conducted Nov. 8-17 and the results have a 5 percent margin of error.

Of those polled who voted in the Nov. 4 election, 52 percent said they did not usually see clear policy differences between Republican and Democratic candidates. But more Republican voters reported seeing such differences than did registered Democrats, independents or minor party members.

Forty-five percent of voters said a candidate's party affiliation was of little or no importance, compared with 54 percent who said it was very or somewhat important.

The vast majority of voters surveyed — 90 percent — said their feelings about a candidate's integrity were very important or somewhat important.

The survey showed 68 percent of the respondents who voted Nov. 4 would support a proposal to limit campaign contributions and spending while providing "qualifying candidates with some taxpayer funds to help pay the costs of campaigns." Democrats, Republicans and independent and minor party voters all voiced strong support for the idea.

In an identical campaign-reform question asked in February 1985, a smaller majority — 60 percent — supported the idea, said Walter Zelman, executive director of California Common Cause.

The survey results indicate that "many voters may be left adrift, unclear as to who represents what," said Zelman.

"Voters may wish to cast their votes intelligently ... but the major parties, traditionally the main vehicles for conveying political and policy options to voters, are not performing that function very well," Zelman said.

---

B4    The Orange County Register    Friday, December 5, 1986

# Pollster praises civic-minded non-voters

## Lack of heartfelt issue kept turnout low, Teichner says

By Larry Peterson
The Register

Disputing the widely accepted view that low voter turnout is bad, pollster Steve Teichner said Wednesday that people who failed to cast ballots on Nov. 4 deserve a "pat on the back."

Teichner, a Santa Ana-based opinion sampler who does surveys for KABC-TV/7 and other stations, analyzed the election, which attracted a record-low 58 percent turnout, in a talk at a County Club luncheon.

"People who stayed at home and didn't vote are just as smart and just as civic minded as people who voted," Teichner told the mostly Democratic group, headed by former state party chairman Richard O'Neill.

Teichner said those who vote typically have the greatest stake in either maintaining or changing the status quo. Turnout is likely to be lower at times, such as this year, when people think things are going all right but not great, Teichner added.

In the recent election, he said,

## OC POLITICAL NOTES

"people seemed to be saying to candidates, 'Don't pull the wool over my eyes; give me a reason to vote for you.'" When candidates weren't able to do so and instead tried to win by attacking their opponents, many citizens "voted" by staying at home, Teichner said.

He said it proved difficult, even in conservative Republican Orange County, for popular political figures such as President Reagan to transfer their support to other GOP candidates.

Reagan, he noted, campaigned twice in the county for his party's U.S. Senate candidate, Rep. Ed Zschau, R-Los Altos, and other GOP candidates, but turnout here was only slightly better than that statewide.

The task of getting Orange County voters to the polls was unusually tough this year for Republicans, partly because of their recent success at registering new voters, Teichner said. Surveys show that most newly registered GOP voters signed up as Republicans primarily because they support Reagan, and many stayed at home because other GOP candidates gave them no strong reason to transfer their loyalty, he said.

In contrast, Teichner said, San Francisco County's relatively high

turnout showed that the electorate still can be mobilized when elections involve things that "people really care about."

In San Francisco, which has a large gay population, opposition was unusually strong to an unsuccessful state ballot measure that would have made it easier to quarantine victims of acquired immune deficiency syndrome, for which gays are a high-risk group. In addition, Teichner noted, there were three hotly contested county supervisorial races there.

### Campaign organizer hired

Cerritos Mayor Don Knabe, a Republican, has hired Ron Smith to run his campaign for the 33rd state Senate District seat that Paul Carpenter, D-Cypress, will give up Jan. 5 to take a seat on the Board of Equalization.

Smith, who is based in Los Angeles, ran Zschau's campaign.

Meanwhile, former Cypress Councilman Otto Lacayo, a Democrat also seeking the 33rd District seat, has hired the Cerritos-based consulting firm of Economy and Bystery, which has managed several winning city council campaigns.

TOCHTERMAN EXHIBIT A, Page 38

4191-0169

Case 2:13-cv-00716-GEB-KJN   Document 26-2   Filed 09/19/13   Page 43 of 45

# Reagan mailer not authorized

## GOP swipe at Assemblyman Floyd for campaign used President's name

**By James P. Sweeney**
Copley News Service

SACRAMENTO — A last-minute campaign mailer bearing President Reagan's signature that portrayed Los Angeles-area Assemblyman Richard Floyd as soft on drug dealers was not authorized by the President's staff, White House officials said yesterday.

The flier was one of at least four Reagan letters used against incumbent Assembly Democrats in the waning days of the campaign. The others — including one sent by San Diego Assemblywoman Lucy Killea's opponent — also may not have been authorized, a White House spokeswoman said.

"The (White House) political office is concerned about the process by which people use the President's name," the spokeswoman said. "It's not taken lightly.

"The counsel to the President is looking into it. Until he is finished ... we are not sure what actions will be taken, if any."

The letters were drafted by the Assembly Republican Caucus' political staff, which played a direct role in the Republican challengers' campaigns.

It is not unusual for Republican or Democratic campaigns to compose and distribute materials under a party leader's name. But most, including Mr. Reagan, insist on prior approval.

The President's political staff, which normally authorizes such letters, did not approve the text of the Floyd letter and possibly others, the spokeswoman said.

Assembly Republican leader Pat Nolan of Glendale declined to return repeated telephone calls but issued a prepared statement late yesterday, admitting the Floyd letter was not cleared by the White House.

A letter of general support for Republican Roger Fiola had been approved, but was revised, Nolan said. Campaign workers inadvertently printed and mailed the new version before it was submitted to Reagan aides, Nolan said.

"Obviously, we regret the wrong letters were sent containing the President's signature without White House approval," Nolan said. "In any event, voters would have received a letter from the President endorsing Fiola. And Assemblyman Floyd was re-elected, so damage to him was minimal."

Other Reagan letters were mailed on behalf of Earl Cantos Jr., who ran against Killea; Henry J. Velasco, who opposed El Monte Assemblywoman Sally Tanner; and Matt Webb, who opposed Riverside Assemblyman Steve Clute, according to Assembly Speaker Willie Brown, D-San Francisco.

Killea won easily, but the Floyd-Fiola race was much closer than expected, Tanner won by less than 8 percent and Clute won by just 2 percent.

Brown singled out the letter distributed against Floyd, branding it "the ultimate in negative campaigning and gutter politics."

The letter quoted the President as saying: "If you believe in the campaign Nancy and I have worked on for the past few years, the campaign to teach our young people to 'Say No To Drugs,' then you must 'Say No To DICK FLOYD' on election day."

Further, it said Floyd "chose to give in to the underworld drug industry when he ... refused to vote on legislation to toughen our anti-drug laws."

Floyd sent a copy of the letter to the President, asking for an explanation.

Floyd's letter to the President said: "I'm a big boy, Mr. President,' and I've been called a lot of names and accused of a lot of things. But to say I 'gave in to the powerful underworld drug industry' ... goes far, far beyond any notion of fair, ethical campaigns.

"I really have problems believing that you would sign such an outrageous, below-the-belt piece of trash.'"

Floyd said the campaign mailer, delivered the day before the election, generated countless phone calls and left his family "humiliated."

"This one really hurt," Floyd said in a telephone interview. "My mom was 85 on Election Day. She goes to her senior citizen things and has to face these people, they all got this letter that says your son is a drug dealer."

The mailers contained a White House return address

TOCHTERMAN EXHIBIT A, Page 39

4191-0170

# Royce calls for investigation into mailer opposing Prop. 51

**By Larry Peterson**
The Register

State Sen. Ed Royce, R-Santa Ana, has asked the District Attorney's Office to investigate the possibility that a slate mailer that blanketed the state this week may violate state election law.

The mailer, delivered Thursday and Friday to more than 2 million households, has angered GOP elected officials, including Royce, whose names were used without their permission.

The mailer gives a long list of suggestions for voting, including partisan and non-partisan offices and state propositions. For partisan races, all of the suggested candidates are Republicans. But while some of those candidates listed paid to have their names included, others say they never had been contacted for permission, or that they had refused.

The mailer, produced by Pacific Ad Mail of Huntington Beach, opposes the Proposition 51 "deep-pockets" initiative on Tuesday's ballot and promotes other candidates who paid to be included in the mailer.

All of the candidates whose names were used without permission, including Gov. George Deukmejian, support Prop. 51. The measure would limit the liability damages that could be awarded for pain and suffering to the extent of the defendant's negligence.

The candidates argue that the inclusion of their names against their wishes implies they are against Prop. 51 and for candidates promoted in the mailer.

But Royce's complaint to District Attorney Cecil Hicks concerns the mailer's use of terms such as "Vote Your Republican Team '86" and "Orange Republican Ticket."

Royce said in the letter to Hicks that the mailer appears to violate portions of what he called the "truth-in-endorsement law."

The law requires endorsement mailers to include a specific disclaimer that must say two things: that the endorsements are by an unofficial political group and that political parties are prohibited by law from endorsing candidates in primary elections.

The mailer does say it is pro-

DAILY RECORDER

FRI. JUNE 13 '86

## Royce sees criminal wrongdoing in mailers

United Press International

An Orange County senator released copies Thursday of his request that the county grand jury investigate alleged criminal wrongdoing by circulators of a slate mailer in the primary election campaign.

The complaint by Sen. Ed Royce, R-Anaheim, accuses Pacific Ad Mail of Huntington Beach and other defendants of misleading Republican voters into thinking the party, contrary to law, had endorsed a GOP election slate.

"Defendants violated the law and they should be punished," Royce said in his letter to the grand jury and district attorney. "It is too late to reverse the damage done to some candidates who refused to be blackmailed into appearing on the mailer. It is not too late to bring the perpetrators of this deceptive mailing to justice."

Royce urged the panel to investigate the mailers' alleged attempt to mislead voters by using the name "Republic Media Group-Republican Ticket," by using Gov. George Deukmejian's name despite his objections, by failing to identify themselves as an unofficial political group as required by law, and by making false statements about Proposition 51.

He estimated that more than 2.5 million mailers were sent statewide.

duced by an unofficial political group but does not cite the ban of endorsements by political parties.

"This is exactly the kind of thing the Legislature had in mind when it passed the law," Royce said. "These official-looking things definitely are misleading."

Jim Corey and Mike Mercier, the Democratic campaign professionals who operate Pacific Ad Mail, could not be reached for comment.

Hicks, however, said that he will have to turn the matter over to the state Attorney General's Office because his name was used on one of the mailers. Hicks, who supports Prop. 51, said he had been told the mailing would support Prop. 51.

Royce said that, if the matter is referred to the Attorney General's Office, an independent special prosecutor will be appointed. He said it would be difficult for Attorney General John Van de Kamp's office to conduct an objective inquiry because Van de Kamp is a leading opponent of Prop. 51.

TOCHTERMAN EXHIBIT A, Page 40

4191-0171

# White House Investigating Phony GOP Endorsements

By KENNETH F. BUNTING, *Times Staff Writer*

SACRAMENTO—Just before the Nov. 4 election, at least four Republican Assembly candidates sent voters endorsement letters "signed" by President Reagan, but neither the President nor any of his aides ever authorized the mailings, a White House official said this week.

Although there actually "were a number of [Republican] candidates in California" Assembly races who used endorsement letters bearing Reagan's signature in their campaigns, none were ever approved or even submitted to the White House for approval, said Ceci Cole, special assistant to the President for political and intergovernmental affairs.

The presidential aide, who was interviewed by telephone from Sacramento on Monday, said the White House legal counsel is looking into the matter in an effort to determine who was responsible for the phony presidential letters, which were made to appear as if they were written on White House stationery.

In the days just before the election, voters received Presidential endorsement letters urging the election of Republican Trice Harvey of Bakersfield, who ultimately defeated Bakersfield attorney Tom Fallgatter by 3,665 votes, and three other GOP candidates who wound up losing to Democratic incumbents.

The phony presidential endorsement letters also were mailed out on behalf of losing Republican candidates Matt Webb, who ran an extremely close but unsuccessful race against Democratic Assemblyman Steve Clute of Riverside; Henry Velasco, who lost decisively to veteran Democratic Assemblywoman Sally Tanner of El Monte, and real estate appraiser Roger Fiola, who lost big to Democrat Richard E. Floyd of Hawthorne.

Presidential aide Cole said that Assembly Republican Leader Pat Nolan of Glendale is cooperating with the White House investigation into who is responsible for the letters, which carried a reproduction of Reagan's signature at the bottom.

But the revelation by Cole that none of the GOP candidates nor their campaign consultants had ever even asked for a presidential endorsement conflicted with a written statement issued last Thursday by Nolan after Assembly Republican officials initially were asked about a "Reagan" letter attacking Floyd and endorsing his opponent.

In that statement, Nolan contended that the "Reagan" letter accusing Floyd of caving in "to the powerful underworld drug industry" merely had been "a modified version" of a White House "endorsement letter of general support" for the GOP candidate.

Cole said: "We know that Pat Nolan had no hand in it and we know that President Reagan wanted Republican candidates to win." And she said the endorsement letters were all sent on behalf of GOP candidates whose elections Reagan might have urged had he been asked. But she added:

"The procedure is important. There are legal rules regarding the President's signature. . . . As with all the President's remarks, it goes through the clearance process. It is a very complicated process [that] takes at least a month."

Cole said in some instances the letters sent to California voters on behalf of Assembly candidates were similar to drafts that had been submitted for use in Congressional campaigns. She said it is conceivable that state legislative campaign organizations "were perhaps under the impression [the congressional letters] were OK for use" in Assembly campaigns.

"But they were not," she emphasized.

Nolan, in a written statement issued last week to explain the letter sent on Fiola's behalf, blamed the supposed mix-up on "campaign consultants" and "campaign workers."

Assemblyman Dennis Brown (R-Signal Hill), who managed Fiola's campaign, said last week that the endorsement letter sent out for Fiola was an inadvertent mistake by Computer Caging, a Sacramento mailing house owned by State Sen. H.L. Richardson (R-Glendora). Computer Caging mailed out the presidential endorsement letter on behalf of Fiola.

But another Republican Assemblyman, who asked not to be identified, said it is a common practice throughout campaigns "to play fast and loose with letters from the White House because most of the time, it would never come to their attention."

TOCHTERMAN EXHIBIT A, Page 41

4191-0172